IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2008

## JOHN R. THOMPSON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Bedford County**
**No. 10595     J. B. Cox, Judge**

_____

**No. M2007-02035-CCA-R3-PC - Filed July 3, 2008**

_____

A Bedford County jury convicted the Petitioner of seventeen crimes involving his sexual contact with three minor girls, and this Court affirmed those judgments on appeal. The Petitioner filed a petition for post-conviction relief alleging that he failed to receive the effective assistance of counsel. The post-conviction court denied the petition, and, after a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Hershel D. Koger, Pulaski, Tennessee, for the Appellant, John. R. Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel West Harmon, Assistant Attorney General; Chuck Crawford, District Attorney General; Michael D. Randles and Ann L. Filer, Assistant District Attorneys General, for the Appellee, the State of Tennessee.

## OPINION

### I. Facts

The Petitioner's seventeen convictions arose out of two separate trials. On direct appeal, this Court reviewed both trials and summarized the facts from the first as follows:

> B.C. testified that she was born on September 27, 1988, and, at the time of trial, she was in eighth grade and was living with her grandparents. She said that her mother was married to the Defendant and had been for several years. She said that,

in the past, she would go and visit her mother and would sometimes spend the night. She explained that her grandparents would take her to her mother's house and then they would pick her up the next day. B.C. testified that, between August and September of 2001, she would visit her mother approximately every other week. B.C. said that, at the time of her visits, the Defendant was living with her mother and her mother was working at the Best Western Motel.

B.C. testified that, between August and September of 2001, the Defendant asked her to pose for some pictures when her mother was not there. She explained that one night, when she spent the night at her mother's house, she slept in the living room on the couch. She said that, around 10:00 p.m., the Defendant woke her up and asked if he could take some pictures. She said that she asked the Defendant where her mother was, and the Defendant told her that her mother had gone to work, which surprised her. She then asked the Defendant where her brother was, and the Defendant told her that he was at a friend's house. B.C. testified that she told the Defendant that he could take some pictures, and he got his camera, which was grayish-silver with a screen on the back. B.C. said that the first few pictures were just normal pictures, and the Defendant asked her to lay on, or stand next to, the couch. B.C. said that she was wearing sweat pants and a shirt.

B.C. said that the Defendant then went to her mother's room, retrieved what he called a "lingerie outfit," and asked her to put it on so that he could take some more pictures. She said that she went to the bathroom and changed into the outfit, and, when she came out of the bathroom, the Defendant took more pictures of her. She said that he then he asked her to pull down part of the outfit so as to expose her breast.

B.C. testified that, on another occasion, the Defendant woke her up around 1:00 a.m. and asked her to pose in lingerie again. She said that he had the same camera and again asked her to remove part of the lingerie to expose her breasts. She explained that he continued to take pictures while her breasts were exposed. B.C. testified that, after taking more photographs, the Defendant asked her to engage in oral sex with him. She said that he unzipped his pants and exposed his penis and that he put his penis in her mouth. B.C. testified that, during this event, the Defendant rubbed the outside of her vagina with his hand and then "put his mouth down there." She said that, when the Defendant touched her, she was wearing sweat pants and underwear, and he touched her underneath both of these articles of clothing, so that his bare skin was on her bare skin. When the Defendant touched his mouth to her "private part," he "moved it around for a little while. Then he looked up at the clock and said [B.C.'s] mom w[ould] be home soon." She testified that the Defendant then told her to watch television, and he went into the computer room. B.C. said that all of this happened before her thirteenth birthday. B.C. testified that she was scared when she and the Defendant were engaged in this activity and the Defendant told her

"Don't worry. It is okay. . . . Most fathers do this to their daughters." B.C. said that she did not tell her mother because she was "scared" of the Defendant.

On cross-examination, B.C. said that her grandmother has never liked the Defendant. She said that she and her grandmother previously had conversations about how "sorry" the Defendant was. She testified that she did not make a statement to police about these events until June 14, 2002, which was nine or ten months after they occurred. She said that she never refused to go over to her mother's house. B.C. testified that, even though she lived at her grandmother's house, which was over an hour from her mother's house, she was still afraid to tell her grandmother what had happened. She also said that she originally denied the events when Lieutenant Hord first asked her about them. B.C. conceded that she never saw any of the pictures that the Defendant took of her, and she was unsure whether there was any film or a disk in the camera. B.C. said that she never had intercourse with the Defendant and that his fingers never went inside her. B.C. also said that, at the time of these incidents, and for a long time before them, she did not like the Defendant because he forced her mother to move away from her. She denied that she was angry that her brother lived with her mother and that she lived with her grandmother.

On re-direct, B.C. said that she did not visit her mother at all in 2002. She also said that when Lieutenant Hord first asked her about the Defendant's conduct, her grandmother was in the room and could hear everything. It was not until her grandmother stepped out that she told the officer about what the Defendant had done.

Upon the Court's questioning, B.C. said that she never saw the pictures that were taken of her, but she knew that the Defendant took pictures of her with a camera.

K.J. testified that she was born on November 27, 1989, and in June of 2002 she was twelve years old. She said that the Defendant had been friends with her family since she was born and that, because of this friendship, she would sometimes spend time at the Defendant's house. K.J. testified that between June 1 and June 8 of 2002 she spent several days in a row at the Defendant's house because her grandfather had died. K.J. said that sometimes the Defendant's wife was there, but that sometimes she would leave to go to work at the Best Western Motel in Murfreesboro.

K.J. testified that, while she was staying at the Defendant's house, he asked her to come out to the shed, which she did. She said that she went into the shed, and the Defendant told her to take her clothes off, which she did. He then told her to play with herself while she was sitting on a bucket that he put her on, and she complied. K.J. said that the Defendant then started playing with her by putting her fingers inside

3

of her vagina and "moving them around." She said that the Defendant then put his tongue inside of her vagina and "moved it around." She also said that the Defendant licked her breasts.

K.J. testified about the "next time" and said that the Defendant did the same thing to her again in the shed after he asked her to go there with him. She said that he again inserted his fingers and tongue in her vagina and that he "licked around on [her breasts] and sucked them." K.J. said that the Defendant told her not to tell anyone or he would get into trouble. K.J. testified that the Defendant told her that he was going to make her a model, and he took pictures of her. She said that the Defendant told her to take her clothes off. K.J. said that, the day after the Defendant sexually interacted with her twice, he took pictures of her. K.J. testified about a third incident in the shed, that happened after the Defendant took pictures of her when he "put his fingers inside her [vagina] and moved them around" and did the same with his tongue. She said that this again occurred in the shed. K.J. said that the Defendant then brought her outside beside the shed and put her on a chair. He then proceeded to digitally and orally penetrate her and then engaged in intercourse with her. K.J. told the Defendant that this hurt her, but he did not stop. K.J. testified about a fourth incident in the shed where the Defendant digitally and orally penetrated her and "sucked on [her] breasts."

K.J. also testified about a fifth sexual encounter with the Defendant that occurred inside of the Defendant's house. She said that the Defendant told his son to go outside and then told K.J. to go to his bedroom. K.J. testified that the Defendant's wife was at work during this encounter. She said that the Defendant took her clothes off of her while she was laying on the bed on her back. The Defendant then took his clothes off and proceeded to digitally penetrate K.J. while asking her if she liked it. K.J. said that the defendant then orally penetrated her, and then he engaged in intercourse with her. She said that she told the Defendant again that this hurt, but he did not stop. K.J. testified that the phone rang, and the Defendant answered the phone. She said he then came back to the bedroom and began masturbating; then he ejaculated on her stomach. K.J. testified that the Defendant told her to go the living room, which she did. K.J. said that she was still naked in the living room and that the Defendant placed her on the couch and then put in a pornographic movie on the television. The Defendant then digitally and orally penetrated her and then again engaged in intercourse with her. She said that this encounter ended when the phone rang again, and the Defendant said it was time for his wife to come home from work.

K.J. testified about another incident that occurred at the motel where the Defendant's wife worked, which was located in Murfreesboro, Tennessee. She said that she was at the motel with the Defendant's wife because she wanted to "get away from [the Defendant]." K.J. said that she went swimming in the motel pool and that,

4

after she got out of the pool and was drying off, the Defendant "showed up." She said that the Defendant had a key to the motel rooms, and she went with him to check the rooms to see which ones were clean. K.J. said that she and the Defendant then entered room number 117, which was located the farthest away from the office by the dumpster, and that the Defendant began to photograph her. She said that, at this time, she had on a two piece bikini and a t-shirt. She testified that the Defendant told her to smile, and she did not want to but he told her to "do it for the camera." K.J. testified that, at some point, the Defendant told her to take her clothes off. While the Defendant was taking pictures, he digitally and orally penetrated her, and then he engaged in intercourse with her. K.J. said that the Defendant took a picture of his penis entering K.J.'s vagina while he was standing behind her. Many of the pictures about which K.J. testified were admitted into evidence during the trial.

K. J. testified that, shortly after this last incident, her visit with the Defendant and his wife was over, and she went home. K.J. said that, when she went home, she told her mother what had happened. K.J. testified that she then spoke with police about her interactions with the Defendant.

On cross-examination, K.J. testified that she had been going to the Defendant's house for approximately five years and that, prior to these events, nothing had happened between the them. K.J. said that the shed, where many of these events occurred, was located on the side of the house and was visible from the road. She said that there are neighbors that live back behind the shed. She testified that the shed has one door on it that locks. K.J. testified that she did not know where the Defendant's stepson was during these events, and, during one of the events, the Defendant's wife and his son were both in the house. K.J. testified that she told the Defendant's stepson what the Defendant had done and that the stepson said that he knew it had been happening all along. She said that, after the morning when the Defendant first had a sexual encounter with her, she again went to the shed with him that evening, but did not think that he would do the same things to her. K.J. testified that every time she attempted to call home the Defendant was around her, so she waited until she got home to tell her mother. K.J. conceded that the Defendant never threatened her.

Rebecca Hord, a lieutenant with the Bedford County Sheriff's Department, testified that her chief notified her that there was a possible child rape case, and he asked her to interview the witnesses and to assist in investigating the case. She said that, as part of her investigation, she interviewed K.J. After interviewing K.J., she determined that the Defendant had a stepdaughter, B.C, and she interviewed B.C. as part of her routine investigation. Lieutenant Hord said that her interview with B.C. lasted from 11:07 a.m. until 11:59 a.m.

The lieutenant said that, as part of her investigation, she went to the Defendant's home with the cooperation of the Defendant's wife. Lieutenant Hord

said that, at some point, she obtained the Defendant's wallet, which contained a master key to the Best Western Motel. The lieutenant testified that she also seized a computer from the Defendant's home to find out if there was anything relevant to any crime stored on the computer. She said that she made arrangements with the Tennessee Bureau of Investigation ("TBI") office in Nashville, specifically with Agent Tom Davis who is the computer specialist. The officer testified that Agent Davis looked at the computer and retrieved photographs from the computer. She said she looked at the photographs and recognized some of them as of K.J. On cross-examination, the officer said that the Defendant gave the police permission to take the computer by signing a consent to search form. She also said that the Defendant did not work at the Best Western Motel.

David Williams, Jr., a sergeant with the Bedford County Sheriff's Department, testified that he met the Defendant at the sheriff's department on June 8, 2002. He said that he obtained permission to search the Defendant's residence from both the Defendant and the Defendant's wife. The officer testified that he and three other officers went to the Defendant's home to conduct a search. He said that when they got to the address they saw a mobile home and a "mini barn" behind the residence. Sergeant Williams testified that he primarily searched the mini barn, and the Defendant was present during this search. He said that, in the mini barn, he discovered a group of photographs in an envelope on a shelf that was concealed by a row of clothes. The officer said that, in addition to the photographs, the police seized a digital camera and a computer from the Defendant's home. Sergeant Williams testified that the Defendant appeared nervous as he observed the officer searching the mini barn. On cross-examination, the officer confirmed that the Defendant provided him permission to search the home and mini barn.

Tom Davis, a computer evidence specialist with the TBI, testified that he received a computer from the Bedford County Sheriff's Department on July 12, 2002. He said that he examined the Defendant's computer and found approximately 700 pictures. He said that, of the 700 photographs, he placed approximately 144 photographs of women, some of which were sexually explicit photographs, on a CD ROM that he then gave to police. Agent Davis presented some of the pictures that he found on the Defendant's computer to the jury. Agent Davis then presented some photographs of the Defendant to the jury. He also presented some pictures of K.J. that he found on the Defendant's computer. The agent confirmed that he found all of these pictures on the hard drive of the Defendant's computer.

On cross-examination, the agent admitted that he did not know from personal knowledge that this computer belonged to the Defendant. He also stated that he did not know who placed the pictures on the computer. The agent testified that the Defendant's digital camera used a "flash card," the pictures on the flash card could be easily downloaded to a computer. Agent Davis explained that, in addition to the photographs of unclothed women, there were normal pictures on the Defendant's

6

computer.

C.G. testified that she was born February 4, 1987, and that she was the person pictured in eighteen of the photographs.

The Defendant called C.C., B.C.'s brother and the Defendant's stepson, who testified that he was eleven years old at the time of trial. He said that, during June 1 through June 8, 2002, he was living with his mother and the Defendant, who is his stepfather. C.C. said that, during this time frame, K.J. came to stay at his house. He said that K.J. never told him that his stepfather was acting inappropriately with her, and he did not see the two acting inappropriately with each other. C.C. testified that K.J. would go in the shed with her boyfriend, who also stayed at the house during that time. C.C. testified that one time he went for a walk while K.J. was at his house, and K.J. was sleeping in C.C.'s bedroom and the Defendant was sleeping in the Defendant's room. When he returned, they both were both still asleep in their respective rooms. C.C. said that he and the Defendant both had access to the computer, and he said that K.J. could have had access to it also. On cross-examination C.C. testified that the Defendant used the computer the most, and the Defendant would use the computer to get on the Internet. C.C. denied that he told police that K.J. told him that the Defendant inappropriately touched her.

The Defendant testified on his own behalf that, around June 8, 2002, he was the maintenance man for the Best Western Motel. The Defendant said that B.C. is his stepdaughter and that she has never lived with him and his wife, but lived with her grandmother. He said that B.C. stopped visiting around Christmas of that year. The Defendant testified that he owned a Polaroid digital camera, the same one that was admitted into evidence at the trial. He testified that he left the camera in different places and that it was used by everyone in the house. Additionally, he said that everyone had access to the computer and that the computer was not protected with a password. The Defendant testified that, in June of 2002, a close relative of his wife's passed away, and K.J. visited them during that week. He said that K.J. came over frequently, as did K.J.'s boyfriend. The Defendant said that he and K.J. got into an argument, and he took her home. He said that she was upset with him for taking her home. The Defendant said that he was never in the shed alone with K.J. and that he never sent his son for a walk by himself on the road.

The Defendant said that, when he found out that he was being accused of inappropriate sexual activity with a minor, he called the sheriff's department and asked them to come out to the house so that he could talk to someone. He said that after approximately five hours no one came, so he called again, and the police told him to come down to the police station, which he did. He said that he gave police permission to search his house. The Defendant said that the police told him that "the young lady says there are pictures in the shed," and the Defendant responded, "Why don't we ride out there and find the pictures" because he had never seen any pictures

7

before. The Defendant denied that he did the acts of which he was accused. On cross-examination, the Defendant said that K.J.'s boyfriend was eleven or twelve at the time of these alleged incidents. The Defendant conceded that the pictures shown earlier in the trial were of K.J. standing in a motel room, unclothed, when she was twelve years old, but he said that he did not take those pictures. The Defendant stated that the pictures were found on his computer and in his mini barn, but reiterated that he did not take the pictures. The Defendant admitted that he had taken pictures of unclothed adult women and put those on his computer, but had never taken any of K.J. or B.C. or any other minor girls. The Defendant denied any sexual contact with B.C. The Defendant admitted that he owned pornographic movies, but denied ever showing them to K.J. The Defendant admitted passing eight worthless checks and admitted that he had four convictions for that offense.

*State v. John Ray Thompson*, Nos. M2003-00487-CCA-R3-CD & M2003-01824-CCA-R3-CD, 2004 WL 2964704, at *1-7 (Tenn. Crim. App., at Nashville, Dec. 20, 2004) (footnotes omitted), *no Tenn. R. App. P. 11 application filed*. We summarized the facts of the second case as follows:

C.G., who also testified at the Defendant's first trial, testified that she was born on February 4, 1987, and in the summer of 2001 she was fourteen years old. She said that the Defendant's wife is her cousin, and so she had known the Defendant her whole life. She said that the Defendant and his wife lived in her parents' home between 1994 and 1995, and she trusted the Defendant. C.G. testified that, during the summer of 2001, the Defendant's wife called C.G.'s sister and asked if C.G. could baby-sit for her. C.G. said that, at that time, the Defendant and his wife were living in an apartment building. C.G. explained that, sometimes when she baby-sat, she would go over to the Defendant's house and spend the night, so that she would be there when the Defendant's son woke up.

C.G. said that, when she was with the Defendant alone in the apartment, he asked her if she had ever taken any pictures and if she would want to be a model. She said that she did not believe the Defendant at first, but then she began to believe him because he had "all kinds of other girls com[ing] over [and] tak[ing] pictures." She said that the Defendant's daughter told her about the modeling and told her that she was making money from it. She testified that a girl named "Kim" called, said that she was an agent, and said that the Defendant's story that he could make her a model was true. The Defendant told her that, if she modeled, she would get clothes and "thousands of dollars." C.G. testified that, when the Defendant was trying to get her to model, he showed her pictures of other young ladies. She said that, some of the pictures were stored on his computer, and others were hidden behind a brick in the garage. In some of these pictures, the subjects were partially or totally nude. She said that, when the Defendant was convincing her to model, he bounced her breast while he complimented her figure. She said that the Defendant also touched her leg and touched her genital area through her clothing.

8

C.G. testified that there was a computer in a computer room over the garage. She said that the computer room was "real little." She said that, at first, the Defendant took pictures of her clothed. C.G. said that, thereafter, the Defendant came into the bathroom where she was showering and took a picture of her while she was showering. She said that, later, she agreed to have her picture taken in her bra and panties, and the Defendant took these pictures of her in the computer room at his house. C.G. said that, ultimately, the Defendant took pictures of her nude. She said that one set of these pictures was taken in the computer room, and the other set was taken in his bedroom. She said that, while these pictures were taken, the Defendant's son was sleeping or playing outside, and the Defendant's wife was at work. Eight pictures taken in the computer room were admitted into evidence, in addition to nine pictures taken in the Defendant's bedroom.

C.G. testified that the Defendant would pose her for the photographs. He also placed a blanket on the floor for her to sit on and gave her a t-shirt to wear during one of the sessions. C.G. said that the Defendant told her to try not to let his wife know about the modeling because she would be mad if a bunch of girls were coming over to the house.

C.G. said that, during the last photography session, the Defendant told her to "close her eyes" and, when she did, he went down and put his mouth on her genital area. She said that she stopped him quickly, and he told her that he did that just to "relax" her. C.G. testified that she then stopped her modeling sessions. She said that she did not tell her parents or police about them until she was contacted by the police.

On cross-examination, C.G. testified that the pictures were taken around July of 2001 and that the touching occurred around that same date. She said that she did not remember telling the police that this incident occurred around Thanksgiving. C.G. conceded that, at first, she lied to the officer about the events because she did not want her family to think badly of her. She said that, later, she told the officer the truth.

David Williams, Jr., an officer with the Bedford County Sheriff's Department, testified that he searched the Defendant's car on June 8, 2002. He said that the Defendant signed a "permission to search form," after which he searched an "outbuilding." He said that, while he was conducting the search, the Defendant seemed nervous. The officer testified that the police seized a digital camera and a computer from the Defendant's home.

Tom Davis, the computer evidence specialist with the TBI, testified that, when he searched the Defendant's computer, he found numerous photographs of C.G. He said that these pictures were stored on the Defendant's hard drive and, according to the computer files, these were pictures stored on June 28, 2001, through July 3, 2001. On cross-examination, Agent Davis said that a person of average

9

intelligence could operate a computer and download pictures. The Agent said that he could not be sure who put the pictures on the computer.

Rebecca Hord, an officer with the Bedford County Sheriff's Department, testified that she asked Agent Davis to search the Defendant's computer for photographs, and, when he found some, she asked him to print images. She said that she recognized C.G. as one of the girls in the pictures. The officer said that, when she first interviewed C.G., C.G. did not know that the police already had pictures of her from the Defendant's computer.

The Defendant testified that C.G. babysat for his son during the "end of June and all of July and the first week in August." The Defendant said that anyone who wanted to turn on his computer had access to it and that a number of people used the computer. He also testified that a number of people used his camera. The Defendant denied taking any pictures of C.G. On cross-examination, the Defendant testified that C.G. would spend the night at his house to babysit. The Defendant admitted that, in one of the pictures, C.G. appeared to be wearing one of his shirts, but he stated that there were many such shirts in the house. He stated that one of C.G.'s friends could have taken the pictures. The Defendant admitted that he had previously been convicted of passing worthless checks.

*Id*. at *8-10 (footnotes omitted).

At the post-conviction hearing, the parties presented the following evidence: The Petitioner testified that his trial counsel ("Counsel") represented him at trial in both cases. Prior to his preliminary hearing, no attorney came to talk with him. After his preliminary hearing, at which he was represented by a public defender, Counsel visited him for about an hour. The Petitioner estimated this occurred approximately one and a half months before trial, and, by this time, he had already been in jail for "months." At this meeting, the Petitioner informed Counsel that he should visit with the Petitioner's mother and wife, and the Petitioner gave Counsel "paperwork," consisting of evidence that he was not at home on one of the days in question, June 4, 2002. The Petitioner claimed, while offering a pay-check stub as supporting proof, that he unloaded drywall in Bell Buckle on June 4, 2002. He stated that he gave Counsel the stub, but Counsel failed to follow up on the issue. Counsel additionally failed to provide the Petitioner with the discovery he obtained. Additionally, although the Petitioner wished to have DNA tests performed, Counsel told him they would not be performed because they would neither help nor hurt his case.

The Petitioner stated that Counsel's second and final visit occurred a few weeks before trial, and this visit also lasted only one hour. At this meeting, the Petitioner claimed Counsel advised him that "[t]he State has no evidence," "[d]on't worry about it," and "[t]hey have nothing." The Petitioner then also recalled Counsel meeting with him the day before trial and in the hallway on the day of trial. When further pressed, he recalled meeting an investigator while he was in jail who obtained a list of potential witnesses. The Petitioner additionally claimed that he and his family made repeated calls to Counsel's office, but they were never able to speak with him.

The Petitioner testified that he relayed to Counsel that he discovered one of the victims, K.J.,[1] and her boyfriend, Thomas Riley, having sex on his couch. The Petitioner recalled that he discovered them on June 8 at approximately 2:30 in the morning. The Petitioner additionally claimed he told Counsel that he heard Thomas Riley "fingered" K.J., took photos of her, and placed these photos on his computer. Counsel told him that he was going to be able to tell his side of the story, but the Petitioner was "cut off" by the State at trial; he was never able to tell the jury what he knew about K.J. With respect to pictures allegedly taken in the Murfreesboro hotel, the Petitioner complained to Counsel that the pictures were taken from outside the "jurisdiction" of the court. Counsel told him to not worry about it.

With respect to the second trial, the Petitioner testified that Counsel was again appointed to represent him. He had already been sent to the Department of Correction, and the Petitioner stated that he did not talk with Counsel between the first and second trials. In fact, the Petitioner stated he only learned about the second trial as he was being transported to it. In addressing the victim of the second case, C.G., the Petitioner testified that she was babysitting for them because "she was fixing to get kicked out because she was having sex with little boys . . . ." The Petitioner claimed that he did not have a chance to explain this to Counsel. He would have had witnesses at the second trial to testify to this, but there was not time. Finally, the Petitioner testified he had no idea, prior to testifying, that he could be impeached with his previous convictions.

On cross-examination, the Petitioner stated that the pay stub was for approximately three hours work in the early evening of June 4, 2002. Additionally, although he knew what information the State would present at the first trial, the Petitioner claimed he did not know the State found pictures of C.G., the victim in the second case. With respect to the checks and previous sexual encounters, the Petitioner admitted Counsel objected to these issues, but the court ruled against him. In addressing the timing of the second case, he claimed he did not know about the second trial because Counsel told him the second case had been dropped. The Petitioner admitted that he knew he was being taken to court for something associated with the second case, but he did not know trial was scheduled for that day. The Petitioner then admitted he knew a trial date had been selected, but he did not know if that would be a preliminary hearing, jury selection, or the actual trial.

The Petitioner additionally testified that his family considered hiring another attorney, Ted Daniel. During one hearing, Daniel stood up and informed the judge that he believed "grave constitutional violations had occurred." Counsel allowed the Petitioner to discuss the situation with Daniel, but, "under advisement from an attorney," the Petitioner decided not to complain about Counsel's representation at that time.

Peggy J. Wimbley, the Petitioner's mother, testified that she visited him regularly in jail after he was arrested. The Petitioner relayed information to Wimbley, and Wimbley attempted to relay the information to Counsel. She went by his office twice and called him twenty-five to thirty times.

---

[1] At trial, this victim was referred to by the initials K.J. At the post-conviction hearing, she was referred to by the initials C.J. We will refer to her as K.J.

Out of those phone calls, she only spoke with him four times. Once Wimbley recalled going to meet with Counsel, but she did not speak with him. Only the Petitioner's stepson, his wife, and his sister were able to speak with Counsel. After the trials, Wimbley requested all the Petitioner's paperwork from Counsel, and, although she did not receive them as quickly as she thought she should have, Wimbley ultimately received what she requested. Wimbley stated, however, that Counsel avoided the family at the Petitioner's hearings. She also told Counsel about a situation when K.J. hung around two boys at a roller-skating rink and about a time when she caught K.J. performing oral sex on Wimbley's grandson; they were six and five at the time. She knew these things at the time of trial, but Counsel failed to call her as a witness to testify. Counsel told her that he felt it would not be prudent to call her as a witness.

Cody Caldwell testified that he lived with the Petitioner at the time he was arrested on these charges. He recalled a young man named Thomas Riley, but he did not recall Riley ever taking photographs and putting them on the Petitioner's computer. Caldwell did remember that Riley and K.J. were boyfriend and girlfriend.

Counsel testified that he reviewed the preliminary hearing transcripts prior to the first trial. He stated that he and the preliminary hearing attorney, Collins, discussed the witnesses and their demeanor. Prior to trial, Counsel possessed statements made by K.J., B.C., and C.G.; a report from Our Kids who examined the victims; and reports from Bedford County Medical Center on K.J. Counsel stated that he and the Petitioner discussed severing the cases, but they determined that the first case, with victims K.J. and B.C., should be tried together because the Petitioner's defense was to deny involvement. Based on this position, Counsel felt it was reasonable to try the cases together.

In addressing his lack of a pre-trial Rule 412 motion, Counsel stated that he felt any pre-trial motion would be denied. Thus, he decided to forgo the pre-trial motion and attempt to introduce the evidence of Thomas Riley and K.J. without putting the State on notice. The State objected to the evidence, and the trial court sustained the objection.

On cross-examination, Counsel testified that he discussed the case with Collins after the preliminary hearing. Collins opined that K.J. and B.C. would be good witnesses at trial. Counsel understood the charges and evidence against the Petitioner, and he met with the Petitioner "at least 10 or 12 times" prior to trial. Counsel looked at the pay-stub provided by the Petitioner and stated that he did not remember ever seeing that document. Even if the Petitioner provided him with the pay stub, it would not serve as an absolute defense to the charges. In addressing the Petitioner's charge that he told the Petitioner the second case would be "dismissed," Counsel stated that he told the Petitioner the indictment would be dismissed, but a superceding indictment would be filed. The Petitioner was present when the trial date was set in open court. Counsel testified that all of the cases were investigated together, and they discussed both cases during their ten to twelve meetings. Counsel stated that the Petitioner's defense remained the same through both trials.

Counsel recalled that the State did not attempt to introduce DNA evidence because the events occurred days before the children were checked. Additionally, Counsel testified that the Petitioner never requested a DNA test on himself. Counsel met with the Petitioner's mother, stepson, and wife

before trial, and learned about K.J.'s intercourse with Riley. Counsel determined, however, that Rule 412 would not permit him to introduce this information. Counsel thought his best chance would be to attempt to introduce the evidence without the State noticing; the State objected and the trial court excluded the evidence. Although Counsel recalled hearing about the skating rink incident, he could not remember being told about the oral sex incident. Counsel chose not to elicit testimony about the skating rink because he thought it was not relevant. He said that, even if he was told about the oral sex, Rule 412 would have probably prevented that testimony.

In determining who would testify, Counsel stated that he, the Petitioner, and the Petitioner's family met after the close of the State's case. The Petitioner determined that his wife might "cop an attitude and become mouthy and make a bad witness," so she was not called to testify. Prior to the Petitioner's testimony, Counsel objected to the State's use of his convictions for passing worthless checks. The trial court allowed the State to use the prior convictions, which Counsel and the Petitioner had discussed. The Petitioner knew that if he testified he would be confronted with his worthless check convictions. Finally, Counsel stated that, when cross-examining child witnesses, he often must take a different approach than normal. Experience has taught Counsel that juries become sympathetic to a child witness when an attorney cross-examines him or her about every little inconsistency.

On redirect-examination, Counsel testified that he does not keep a log of how many times he speaks or meets with a client. Counsel passed on discovery to the Petitioner in a timely manner and considered the witnesses proposed by the Petitioner. Ultimately, Counsel refused to use some of the witnesses because he knew their testimony would be perjury.

The post-conviction court, in a memorandum opinion, denied the Petitioner's petition for post-conviction relief. It is from this decision that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner raises the general issue that he failed to receive the effective assistance of counsel. More specifically, the Petitioner alleges that: (1) Counsel failed to adequately cross-examine the victims; (2) Counsel failed to investigate; (3) Counsel failed to file a Tennessee Rule of Evidence 412 motion; and (4) Counsel failed to prevent improper cross-examination of the Petitioner. We additionally note that the Petitioner raises a related issue, that Tennessee's standard for ineffective assistance of counsel cases is unconstitutional according to established United States Supreme Court precedent. We will first address this issue, with the remaining issues in turn.

### A. Constitutionality of Tennessee's Ineffective Assistance of Counsel Standard

As this Court has repeatedly stated, in order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). Pursuant to the statute, the petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The Petitioner argues that this "clear and

13

convincing" standard is irreconcilable with that of *Strickland v. Washington*, the polestar ineffective assistance of counsel case.

In *Strickland*, the United States Supreme Court explained the following two-prong test applied to claims of ineffective assistance of counsel:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989). If a petitioner clears the first hurdle of proving deficiency, he must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). It is this "reasonable probability" standard that the Petitioner claims conflicts with Tennessee's clear and convincing evidence standard.

Our review of the issue leads us to the conclusion that the two standards do not conflict. A petitioner must prove disputed factual allegations by clear and convincing evidence. For example, in this case, the Petitioner claimed he gave Counsel a pay-stub allegedly proving he was moving drywall in Bell Buckle on June 4, 2002. Counsel disputed this, claiming he never received the pay-stub. The Petitioner must prove by "clear and convincing" evidence that he actually gave Counsel the pay-stub. If he does not meet this burden, we analyze the case as though the Petitioner did not give the pay stub to Counsel. Having resolved that factual dispute, we would then proceed to the two-prong *Strickland* test, analyzing deficiency and prejudice. In other words, "clear and convincing" is the burden of proof. Deficient representation and a reasonable probability of a different outcome is what must be proven. In this respect, the statute is not in conflict with established precedent. Further, the Tennessee Supreme Court has upheld and applied this statute in numerous cases, and we are bound by the rulings of that court. *See, e.g., Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003)*; Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002). The Petitioner is not entitled to relief on this issue.

## B. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). As noted above, the following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Counsel failed to adequately cross-examine the victims

In his first allegation of ineffectiveness, the Petitioner goes to great length to point out the various inconsistencies in the victims' testimony and prior statements. He argues that Counsel's failure to adequately cross-examine the victims with their prior inconsistent statements amounted to the ineffective assistance of counsel. Specifically, the Petitioner notes Counsel failed to cross-examine K.J. about her inconsistent statement concerning the dates, times, and relationships of the four episodes. Additionally, the Petitioner argues Counsel failed to cross-examine K.J. about statements allegedly made by the Petitioner and about her relationship with Thomas Riley. With respect to C.G., the Petitioner alleges Counsel failed to adequately cross-examine C.G. about inconsistencies concerning where the Petitioner touched her and what she was wearing during the incidents.

At the post-conviction hearing, Counsel testified that he obtained all of the victims' statements prior to trial, and he believed he cross-examined the victims adequately. He also noted that a particularly harsh cross-examination of a child might make the jury sympathize with the child. Therefore, he chose not to emphasize every particular inconsistency in linear order as a tactical strategy.

The post-conviction court found the following with respect to Counsel's cross-examination:

A careful review of the trial transcript reveals that Counsel used the statements made at other times and places effectively in his cross examination of the victim. He asked questions concerning timing of events and sequence of events and about the presence or absence of witnesses to the events that reflect that he was in possession of these statements. Several questions asked by Counsel illustrate the inconsistency in the victims testimony concerning the dates and times the events occurred, whether or not she was on her period, whether or not she had told Detective Elliot or someone else something different. The mere fact that he did not approach his questions in a chronological line by line approach does not mean that the questions were ineffective. Counsel asked questions designed to show the jury that inconsistencies existed in the timeline, in the ability of the victim to recall the events, in the ability of the victim to remember all of the details concerning when and were certain events occurred, whether or not pictures were taken, what directions were given to her by the Petitioner and whether she was afraid or was engaging in the conduct for some other reason. The Petitioner has not shown this approach is below the standard of care of attorneys in criminal cases, nor has he shown that prejudice of this approach. A constant thread in Counsel's approach is to bring out inconsistencies while not upsetting the young witness nor alienating the jury to his client.

We reviewed Counsel's cross-examination of the victims, and we come to the same conclusion. During cross-examination, K.J. admitted she could not recall on what date the incidents

16

occurred, and she was imprecise in recalling specific times. Counsel also cross-examined K.J. about Thomas Riley and any possible bias K.J. may have had against the Petitioner, although the trial court prevented Counsel from questioning K.J. about her sexual relationship with Riley.

With respect to C.G., Counsel cross-examined her about inconsistencies in pre-trial statements concerning the date on which the events happened. Specifically, Counsel questioned, "So you are saying that you knowingly lied about this?" C.G. responded, "Yes, with my family sitting there, the first time I got called to her office." Counsel asked, "But you are trying to tell these people that you are not knowingly lying today, right?" C.G. stated, "Yes."

We recognize that Counsel did not specifically confront C.G. with inconsistent statements concerning where she alleged the Petitioner touched her and concerning what she wore during the incident. Ultimately, however, we agree with the trial court that Counsel skillfully cross-examined K.J. and C.G. using their pre-trial statements. Further, a decision to refrain from harsh line-by-line cross-examination is within the discretion of Counsel in this case, particularly because of the age of the victims. *House*, 44 S.W.3d at 515. The Petitioner has not proven Counsel was deficient in this respect.

### 2. Counsel failed to investigate

Next, the Petitioner complains that Counsel failed to adequately investigate and prepare for the two trials because he met with the Petitioner only twice and failed to investigate the alibi defense provided by the pay-stub. The post-conviction court accredited the testimony of Counsel, who testified that he met with the Petitioner ten to twelve times and was prepared for both cases. Counsel additionally testified that the Petitioner never provided him with the pay-stub, but, even if the Petitioner had provided the stub, it would not have provided an adequate defense as the alleged work only required three hours, while the crimes occurred over several days.

Based on our review of the record, we agree with the post-conviction court's finding that Counsel met with the Petitioner a number of times, spoke with potential witnesses, and proceeded to trial based on the Petitioner's defense of, "I didn't do it." As such, Counsel was not deficient. Further, the Petitioner has failed to prove any prejudice.

### 3. Counsel failed to file a Rule 412 motion

Next, the Petitioner complains that Counsel failed to file a Rule 412 motion to introduce testimony that K.J. and Riley had sex on the Petitioner's couch. Counsel testified that he found no basis under Rule 412 to introduce the statement; therefore, he attempted to "slip it by" the State at trial. The State objected to the testimony, and the trial court excluded it. The post-conviction court ruled that the Petitioner provided no basis under Rule 412 to admit the evidence, and, therefore, the Petitioner was not prejudiced by Counsel's failure to make the motion.

Rule 412 generally prohibits the use of specific instances of the victim's "sexual behavior." Certain exceptions apply, and the one of arguable applicability to this case concerns credibility. If

17

certain procedural requirements are followed, specific instances of sexual behavior may be admitted if "[o]ffered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim[.]" Tenn. R. Evid. 412(c)(2).

To support his argument that the "credibility exception" applies in this instance, the Petitioner cites to K.J.'s numerous inconsistent *pre-trial* statements concerning her sexual relationship with Riley. The statements come from the following sources: (1) a medical record; (2) an interview with a sheriff's department deputy; (3) an interview with a sheriff's department lieutenant; and (4) the preliminary hearing. The Petitioner cited no statements made either by the State or the victim at trial.

In our view, in order to "rebut the specific evidence presented by the prosecutor or victim," the State or victim must "present evidence at as to the victim's sexual behavior" at the proceeding in which the defendant seeks to introduce the evidence. *See State v. Collin S. Johnson*, No. M2001-01973-CCA-R9-CD, 2002 WL 992402, at *5 (Tenn. Crim. App., at Nashville, May 15, 2002) (stating Rule 412(c)(2) evidence must be presented "to *rebut* testimony offered by the state.") (emphasis added), *perm. app. denied* (Tenn. Oct. 14, 2002). In other words, for a defendant to utilize this exception at a trial, the State or victim must present the evidence at the trial. Similarly, if the defendant seeks to utilize the exception at a preliminary hearing, the State or victim must present the evidence at the preliminary hearing.

On post-conviction appeal, the Defendant argues that Counsel could have successfully pursued a Rule 412 motion, and he was thus ineffective. However, because the State and victim presented no evidence at trial concerning the victim's sexual behavior, the credibility exception to Rule 412 does not apply, and a Rule 412 motion would not have been successful. Thus, as the post-conviction court found, there was no prejudice from Counsel's tactical decision. The Petitioner is not entitled to relief on this issue.

### 4. Counsel failed to prevent improper cross-examination of the Petitioner

Finally, the Petitioner complains that Counsel failed to prevent him from being improperly cross-examined with "bad check convictions." The Petitioner cites to *Bunch v. State* for the proposition that evidence of other crimes is generally not admissible. 605 S.W.2d 227, 229 (Tenn. 1980); *see generally* Tenn. R. Evid. 404(b). The post-conviction court found that Counsel attempted to exclude the check convictions, but, after unsuccessful argument, he informed the Petitioner that the check would be used to impeach him should he testify. We agree with the post-conviction court. Counsel made an objection, but the checks were properly allowed under Rule 609 for the purpose of impeachment. Counsel advised the Petitioner they would be used against him should he testify. The Petitioner has not proven Counsel was deficient in this respect. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude that the Petitioner has not proved he failed to receive the effective assistance of counsel. The judgment of the post-conviction court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE